IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 9, 2025

**STATE OF TENNESSEE v. ROMEAKA EVANS**

**Appeal from the Criminal Court for Shelby County**
**No. C2302857      Carlyn L. Addison, Judge**

————————————————————

**No. W2024-01923-CCA-R3-CD**

————————————————————

Romeaka Evans, Defendant, was indicted by a Shelby County Grand Jury for second degree murder. After a jury trial, she was convicted as charged and sentenced to twenty-five years in incarceration as a Range I, standard offender. The trial court denied a motion for new trial, and Defendant appealed, arguing that the trial court improperly denied a mistrial, that the evidence was insufficient, and that the trial court imposed an improper sentence. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR. and TOM GREENHOLTZ, JJ., joined.

Gerald S. Green (on appeal); John Dolan (at trial), Memphis, Tennessee, for the appellant, Romeaka Contrell Evans.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Monica Timmerman and Katie Ratton, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Shelby County Grand Jury indicted Defendant for one count of second degree murder for the death of the victim, Jermaine Thomas. The victim was forty-three years of age at the time of his death and had quit his job as a manager at Dollar General a few months before his death because of renal failure.

The victim's son, Jaylen Thomas, testified that he spoke with his father for the last time on November 1, 2022. It was the victim's birthday. Mr. Thomas described their relationship as "great" even though they did not live in the same city. They often connected via FaceTime. Mr. Thomas knew the victim's health was not good, as the victim suffered from "issues with his kidneys" and "high blood pressure." Mr. Thomas also spoke to Defendant on FaceTime on November 1. She "peeked around from the background" to say hello. Mr. Thomas "never knew" the victim and Defendant as being "an item." In other words, the victim had never introduced Defendant to Mr. Thomas as his girlfriend.

Mr. Thomas received a Facebook telephone call from Kimberly Johnson on November 2 notifying him that his father was dead. Mr. Thomas did not know Ms. Johnson before the phone call. After the victim's death, Mr. Thomas went to the victim's apartment and retrieved "a few items," including a computer tablet, watch, and cell phone. Mr. Thomas went through the "audio files" on the tablet to see if there was anything "that could maybe help." Mr. Thomas discovered an audio file from "that morning" of the stabbing, November 2. He recognized the victim's voice and Defendant's voice on the recording. He turned the tablet over to the police. The recording was introduced as an exhibit. In the recording, Defendant and the victim are talking. The victim stated that Defendant slapped him three times. The victim stated that she never touched Defendant. The victim told Defendant that he loved her. The victim and Defendant can be heard arguing about money and who purchased what items in the apartment. The victim claimed that he purchased everything and that Defendant did not buy anything. At one point, the victim can be heard saying, "Don't put your hands on me." The victim can be heard speaking in a low voice at one point that this recording is "for the police, when you all come."

Ms. Johnson testified that she met Defendant at work at Warren Manor Nursing Home in approximately 2010 or 2011. They remained friends until they had a "falling out" in 2018. In 2022, they rekindled their friendship. Defendant was living in Memphis at the time, talking to Ms. Johnson "almost every other day." Defendant was dating the victim at the time. Ms. Johnson never met the victim in person but met him "over the phone" and was friends with him on Facebook.

Ms. Johnson spoke with Defendant "several times" on November 2, beginning with a "message" from "Messenger at 7:20 – something a.m." that contained a picture of Defendant's half-sister. Then Ms. Johnson "end[ed] up calling [Defendant] or something like that." She thought they "got off the phone around eight" but was not exactly sure of the time. Defendant and the victim were "into it, and [Defendant] told [her] she was [going to] call [her] back but she never hung the phone up and they w[ere] still fussin[g]." Ms. Johnson heard the victim say "don't burn me with the cigarette," and Defendant reply "I'm not gone burn you with no cigarette." The argument was not out of the ordinary. Ms. Johnson eventually hung the phone up and went on about her day.

Defendant called Ms. Johnson a "second time." Ms. Johnson was in the car with her children and answered the call on speakerphone. Defendant told her "Jermaine dead, I killed Jermaine." Ms. Johnson was "shocked" and "cussed" and accused Defendant of lying. Ms. Johnson asked Defendant if she called the police. Defendant told her "no" and that "she was told not to call until the auntie made it there." Ms. Johnson located the number for "dispatch" in Memphis and "told them what happened." Ms. Johnson was informed that there were already officers on the scene.

Ms. Johnson was "shocked." Her wedding was scheduled for November 4, and she thought Defendant might be "joking." She called the victim "four or five times on Messenger" and "didn't get an answer." She could not contact any of his friends, so she "reached out to his son." Mr. Thomas called her. Ms. Johnson told him Defendant "called [her] and told [her] that she had killed" the victim.

Officer Timmy Mitchell testified he was one of the first officers on the scene. He was instructed by dispatch to go to Apartment 10. Dispatch did not report the incident as a homicide, so Officer Mitchell was only accompanied by one other officer. He explained that if the call came in as a homicide, many more officers would have responded to the call. As Officer Mitchell attempted to locate the apartment, he was approached by a female whom he later identified as Defendant. She told Officer Mitchell that she "stabbed" her boyfriend and thought that she "killed him." The actual location of the incident was "Apartment 14" not Apartment 10 as reported by Defendant.

Officer Mitchell entered the apartment, checked the victim's "wrist" and noticed that he was "cold to the touch." The victim was clearly deceased. There was blood on the floor, and the victim "looked like he had been there for a while because the blood had already started drying up." There was a knife at the scene. Officer Mitchell's body camera video was entered into evidence.

The crime scene police officer, Dennis Williams, testified that he took pictures at the scene. The victim was lying on the floor with one arm across his body and the other arm outstretched. There was blood on the carpet next to the victim's body. A large knife covered in blood was also near the body. A folded dollar bill with "white powdery residue" was lying on the floor next to the victim's left foot. Officers found guns and ammunition in the apartment, but they were not near the victim's body. Officer Williams examined Defendant with an alternative light source ("ALS") after she was taken into custody. He explained that the ALS could show injuries that are not visible to the naked eye. According to Officer Williams, no injuries were visible using the ALS.

According to the medical examiner, Dr. Marco Ross, the victim died because of a stab wound to the chest. The four-inch-deep wound perforated the interior left second rib, the pericardial sac, right ventricle wall, and the intraventricular septum. The victim had alcohol and cocaine in his system at the time of his death.

Defendant testified that she had lived in Memphis for about thirty years and was divorced with a nineteen-year-old son. She met the victim at an "apartment hotel on American Way and Cherry Road" at the end of 2018. He was working as a manager at a Dollar General. She moved out of the hotel first, to Wateredge Apartments. The victim moved to the same apartment complex. Defendant later moved to Raintree Apartments in Whitehaven. She did not have a car at the time, and her son was living with her. She continued her relationship with the victim after she moved. The victim paid for an Uber or a Lyft for transportation to his apartment. When Defendant visited the victim, she would stay for two or three days, "sometimes longer." She and the victim were "intimate." She described the victim as a "great person" who was "dependable." Defendant said the victim's only issue was "his drug issue" that "caused him to be a different person" when "he was high." Defendant had to quit his job because of "kidney failure." He was on dialysis three times a week. At first, he drove to dialysis, but eventually he got a machine at home. Defendant said that the victim continued to use drugs and drink alcohol while he was on dialysis. Defendant admitted that she was five-feet-one-inch tall and that the victim was around six-feet tall.

Defendant admitted that she stabbed the victim. According to her account of November 2, the victim "had been up all night" doing drugs. The victim woke her up and told her that she snored too loudly. She left the bedroom and "went into the living room and [] proceeded to go back to sleep." The victim followed her to the living room, and "had his phone." He asked her if she was "sleeping with this person." Defendant did not know who the victim was talking about. He "attacked [her] based on his own accusations" against her. The victim "whipped" her in the face, told her that he did not give a "f**k" about her, and choked her. The couple argued back and forth. Defendant was in the kitchen by that point, and the victim was still in the living room. Defendant stated that the victim was "charging at [her] to choke [her] again and that's when [she saw] the knife on the table and [she] stabbed him." Defendant said it was not her intention to kill the victim; "[i]t was to get him to stop."

Defendant had a cell phone number that was previously registered to "Latanya Evans." She estimated that she waited for fifteen minutes to call the police and 911. She called her mother first and then her aunt. Next, she called "a close friend." She claimed her phone "locked up" and would not allow her to make any more calls, so she "went downstairs" and "got the neighbor to call the police." She admitted that she told the dispatcher that her name was Latanya Evans because it was the "name of the phone that

the phone number was on." She also told officers that she was in Apartment 10. She admitted she "was guessing" the apartment number because she did not know it. When police arrived, she met them and told them what had happened.

Defendant explained, in referring to the stabbing that she "didn't intend for that to happen at all." She described it as a "bad, bad, real bad experience" where the victim was "high." She described herself as "unstable" and explained that she had PTSD from "being molested" when she was younger.

Defendant admitted that she received text messages from the victim on October 31, 2022, stating that he did not "want to be with" Defendant anymore and that he was "done." Defendant claimed that she did not read the messages. Defendant also admitted on cross-examination that she had a key to the apartment and that she was staying over there most of the time for the "four to six weeks" before the victim's death.

Defendant admitted that she moved the body after she stabbed the victim and that she did not tell the police that she moved the body. She claimed that she moved the victim so that she could apply pressure to the wound.

Defendant claimed that she was injured by the victim when he choked her and that Defendant held a gun to her head. She admitted that the ALS did not show any bruising but pointed to locations on photographs that she claimed depicted a black eye and a scratch on her neck.

Toni Evans, Defendant's mother, testified. She stated that she never met the victim but had talked to him on the telephone "[m]any a times." She never talked to him alone on the phone, but when she called Defendant, the victim made Defendant answer the phone on speakerphone. Ms. Evans described the victim as "manipulative" and "controlling," and she said "When a conversation d[id]n't go the way he wanted it to go, the phone [would] go dead."

Melvin Evans, Defendant's father, also testified. He also claimed to have never met the victim in person but did talk to him on the phone. He stated that the victim made Defendant put the phone on speakerphone and would "tell her what to say." He talked to the victim on the phone two or three times. He described the victim as "[c]ontrolling."

Jaleesa Pete testified as a rebuttal witness for the State. She was the victim's cousin. The victim attended her wedding in August of 2022. She met Defendant in September of 2022. She described Defendant's relationship with the victim as "toxic" and knew the victim used cocaine but had never seen him use it. She described the victim as "chill"

when he was high and drunk. She encouraged the victim to record his conversations with Defendant after she witnessed the couple "fussin" with each other.

Sharrell Thomas testified that at the time of trial, she and the victim had a seven-year-old daughter. She did not know the victim used cocaine and described him as "great" but acknowledged that he had other "lady friends" while they were together.

Latanya Langford also testified for the State. She dated the victim from 2019 to September of 2022 and said the victim was not controlling or manipulating. They were "on a break" in September of 2022 after a "disagreement." She saw Defendant once and testified that Defendant "used to call to play on [her] telephone" and "threaten" her. She never saw the victim use cocaine.

At the conclusion of the proof, the jury found Defendant guilty of second degree murder. At the sentencing hearing, Defendant was sentenced to twenty-five years as a Range I, standard offender. Defendant filed a timely motion for new trial, and the trial court denied the motion. Defendant appealed.

*Analysis*

*Failure to Grant a Mistrial*

Initially, Defendant argues that the trial court erred in denying a mistrial after the jury "was exposed to prejudicial external content." Specifically, Defendant refers to the court television headline reading "wife stabs husband murder trial" that was displayed to the jury during the State's presentation of the evidence. Defendant insists that the trial court abused its discretion by denying a mistrial. The State disagrees, countering that the trial court "properly exercised its discretion in denying the motion when it considered the nature of the display, its quick response, the curative instruction it provided, and the evidence at trial."

During Defendant's cross-examination, the State tried to display an exhibit to impeach Defendant's testimony about her alleged injuries. The State asked the trial court clerk to turn on the court television. As the television was turned on, an image was displayed with the words, "wife stabs husband." Counsel for Defendant immediately alerted the trial court and the court asked the jury to leave the courtroom and took a recess. Defense counsel requested a mistrial based on the display, noting that the jury saw it and at least one juror commented on the display. The State requested a curative instruction.

As to the image on the television screen depicting the headline "wife stabs husband" and "murder trial," the trial court determined that there was no "bad act on the part of the

State with what was reflected on the" television.  The screen depicted a "case on the TV that has absolutely nothing to do with this case."  The trial court found it would not "be a deprivation of a fair trial" for Defendant.  The trial court told counsel there would be a "curative instruction" and would "ask for the jurors to put that out of their mind, [and] out of their memory."

The trial court gave the following curative instruction:

Before the break, there may have been some information that was broadcast on a device that caused some obvious concern.  It is my job to make certain that you understand the task at hand and the oath that you took and what you swore to do.  You swore to get evidence from this chair.  You swore to be fundamentally fair to [Defendant].

If you saw or heard anything, it is my respectful wish to you and what I'm asking of you, is to put it out of your mind.  Give it no weight.  It has nothing to do with what we are tasked to do here in Criminal Court Division 5 and everything we've worked on this week.  Completely unrelated.  Don't discuss it amongst yourselves.  You're not to take it to deliberations.  Just one of those things and we move on.  Do I have a commitment from you?

A mistrial exists "to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Welcome*, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007) (citing *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)).  "Normally, a mistrial should be declared only if there is a manifest necessity for such action." *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003).  Stated differently, "a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000).  The party seeking a mistrial bears the burden of establishing manifest necessity. *Id.* at 527.  We review a trial court's decision to grant or deny a mistrial for abuse of discretion. *State v. Bell*, 512 S.W.3d 167, 187 (Tenn. 2015) (quoting *State v. Reid*, 91 S.W.3d 247, 279 (Tenn. 2002)).  "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Gevedon*, 671 S.W.3d 537, 543 (Tenn. 2023) (quoting *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010)).  Our supreme court has recognized three nonexclusive factors a reviewing court should consider when determining whether a trial court should have granted a mistrial because of inappropriate testimony before the jury: "(1) whether the State elicited the testimony, or whether it was unsolicited and unresponsive; (2) whether the trial court offered and gave a curative jury instruction; and (3) the relative strength or weakness

of the State's proof." *Bell*, 512 S.W.3d at 188 (quoting *State v. Nash*, 294 S.W.3d 541, 547 (Tenn. 2009)).

Here, the jury was exposed briefly to the image on the court television. The image was not "elicited" at the direction of the State and was unrelated to Defendant's case, so it was not prejudicial. The trial court immediately took a recess, addressed the situation with the parties, and gave the jury a curative limiting instruction. We generally presume that the jury follows the trial court's instructions. *State v. Butler*, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). To support her argument, Defendant relies on cases addressing pre-trial jury exposure to news coverage related to the actual case for which the jury was hearing. *See e.g. State v. Morgan*, 825 S.W.2d 113 (Tenn. Crim. App. 1991). This is not what happened herein. The item shown on the screen was not about Defendant's case. Moreover, as discussed below, the State presented overwhelming evidence of Defendant's actions during the trial. Defendant has failed to establish a manifest necessity for a mistrial.

*Sufficiency of the Evidence*

Defendant argues that the evidence was insufficient to support her conviction for second degree murder because her testimony established that "she acted in self-defense following repeated acts of domestic violence by the victim, who was intoxicated and aggressive" and that her "account" was supported by witness testimony and forensic evidence. The State disagrees, noting that the jury heard and rejected Defendant's self-defense argument and that the evidence, when viewed in the light most favorable to the State, supports the verdict.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009) (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this Court is "whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Parker*, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)). When this Court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005); *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review

for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *Hanson*, 279 S.W.3d at 275). Circumstantial evidence alone may be sufficient to sustain a conviction. *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). When considering the sufficiency of the evidence, this Court shall not substitute its inferences for those drawn by the trier of fact. *Id.*

To sustain a conviction for second degree murder, the State was required to prove beyond a reasonable doubt that Defendant unlawfully and knowingly killed the victim. T.C.A. §§ 39-13-201, 210(a)(1). "A person acts knowingly . . . when the person is aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-302(b). "[T]he 'nature of the conduct' that causes death is inconsequential." *State v. Page*, 81 S.W.3d 781, 787 (quoting *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000)). Thus, a knowing intent is shown if the defendant acts with an awareness that his conduct is reasonably certain to cause the victim's death. *See id.* at 790-93. Whether a defendant acted "knowingly" is a question of fact for the jury. *State v. Inlow*, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). "A person can act knowingly irrespective of his or her desire that the conduct or result will occur." *State v. Gray*, 960 S.W.2d 598, 604 (Tenn. Crim. App. 1997) (citing *State v. Rutherford*, 876 S.W.2d 118, 120 (Tenn. Crim. App. 1993)). In assessing the defendant's intent, the jury may rely on "the character of the assault, the nature of the act and [on] all the circumstances of the case in evidence." *Inlow*, 52 S.W.3d at 105 (citing *State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

Defendant relied on a theory of self-defense. In Tennessee, the right to use deadly force in self-defense is limited to circumstances in which a person reasonably and sincerely believes there is an imminent danger of death or serious bodily injury. *See* T.C.A. § 39-11-611. At the time of Defendant's offense in October of 2022 the self-defense statute read, in pertinent part, as follows:

> (b)(1) Notwithstanding § 39-17-1322, a person who is not engaged in conduct that would constitute a felony or Class A misdemeanor and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.
>
> (2) Notwithstanding § 39-17-1322, a person who is not engaged in conduct that would constitute a felony or Class A misdemeanor and is in a

place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

> (A) The person has a reasonable belief that there is an imminent danger of death, serious bodily injury, or grave sexual abuse;

> (B) The danger creating the belief of imminent death, serious bodily injury, or grave sexual abuse is real, or honestly believed to be real at the time; and

> (C) The belief of danger is founded upon reasonable grounds.

> . . . .

> (e) The threat or use of force against another is not justified:

> (1) If the person using force consented to the exact force used or attempted by the other individual;

> (2) If the person using force provoked the other individual's use or attempted use of unlawful force, unless:

> > (A) The person using force abandons the encounter or clearly communicates to the other the intent to do so; and

> > (B) The other person nevertheless continues or attempts to use unlawful force against the person; . . . .

T.C.A. § 39-11-611(b)(1), (2), and (e). Deadly force is "the use of force intended or likely to cause death or serious bodily injury." *Id.* § 39-11-611(a)(4). "Serious bodily injury" involves: "[a] substantial risk of death," "[p]rotracted unconsciousness," "[e]xtreme physical pain," "[p]rotracted or obvious disfigurement," "[p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. . . ." *Id.* § 39-11-106(a)(37).

A defendant can use the defense of self-defense when there is a "genuine, well-founded fear that [the defendant] was in danger of death or great bodily harm[.]" *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). This belief must "meet an objective

- 10 -

standard of reasonableness to be justified," and "the mere fact that the defendant believes that h[er] conduct is justified would not suffice to justify h[er] conduct." *State v. Bult*, 989 S.W.3d 730, 732 (Tenn. Crim. App. 1998). When a defendant relies upon a theory of self-defense, it is the State's burden to show that the defendant did not act in self-defense. *State v. Sims*, 45 S.W.3d 1, 10 (Tenn. 2001). However, it is within the prerogative of the jury to reject a claim of self-defense. *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). In other words, in Tennessee, "whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." *Id.* (citing *Ivy*, 868 S.W.2d at 725).

Here, viewing the evidence in a light most favorable to the State, the proof at trial shows Defendant killed the victim by stabbing him in the chest with a large knife. Defendant admitted that she stabbed the victim, and the testimony from the officers who responded to the scene and the medical examiner confirmed that the knife wound killed the victim. Defendant admitted that she waited to call for help until after she called other people. The jury heard the victim and Defendant argue in the recording on the tablet taken mere hours before the stabbing. Defendant claimed that the victim was intoxicated, attacked her, choked her, and was about to attack her again when she stabbed him. However, the jury heard this proof and rejected the self-defense theory, as was their prerogative. Moreover, the State introduced proof that the victim did not have any wounds that were visible even with the use of an ALS. The evidence was sufficient to support the verdict. Defendant is not entitled to relief.

*Sentencing*

Lastly, Defendant argues that the trial court imposed an "excessive" sentence by using enhancement factors that were "an essential part of the crime" and failed to consider mitigating factors. Specifically, Defendant argues that the trial court enhanced her sentence based on the application of enhancement factors (5), (6), (9), and (10) and that enhancement factors (5) and (6) were applied improperly. T.C.A. § 40-35-114 (5), (6), (9), & (10). The State counters that Defendant is "wrong" and that the trial court did not abuse its discretion in sentencing Defendant to the maximum sentence in the range.

This Court reviews the length, range, and manner of service imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). The trial court is granted broad discretion to impose a sentence anywhere within the applicable range and the sentencing decision of the trial court will be upheld "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10

In determining a defendant's sentence, the trial court is to consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors; (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the defendant in his own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* T.C.A. § 40-35-210(b); *see also Bise*, 380 S.W.3d at 697-98.

The trial court commented that it "considered the evidence presented at the trial and during this hearing, the presentence report, the principles of sentencing and arguments made as to sentencing alternatives, the nature and characteristics of the criminal conduct involved, the evidence and information offered by the parties on the mitigating and enhancement factors." As a result, the court's determinations are afforded a presumption of reasonableness.

At the sentencing hearing, the trial court commented that Defendant was a Certified Nursing Assistant who had a "better grasp of the human anatomy versus a lay person" The trial court noted that Defendant's testimony was that she "was basically defending herself," that she had "some prior traumatic experiences," and that the incident with the victim "maybe [] triggered some emotional response in her if they were, in fact, fighting." The trial court found the stabbing to be a "deliberate act" on the part of Defendant and found it important that there was "a great bit of time from the initial puncture" and the arrival of law enforcement based on the "cool" temperature of the victim's body. The trial court found Defendant had a "terrible institutional history, " pointing to the presentence report which listed five charges for "refuse or disobey staff orders", being placed on suicide watch, a "verbal altercation," and "displaying unstable behavior." The court noted when she read through the presentence report, specifically in the documents regarding Defendant's institutional history, she "audibly gasped" when she read that Defendant told someone, "Check my charge hoe. I killed somebody for fun." The trial court found this showed a "detachment from reality, responsibility, and remorse for the life she stole." The trial court labeled Defendant a "killer" and a "thief" of the victim's life. The trial court noted the "chilling" statements by the victim in the audio recording that Defendant "slapped" him three times on his birthday, describing the abuse he suffered at the hands of Defendant hours before she killed him. The trial court noted that Defendant then gave a "wrong name" and told dispatch that a person was "hurt." The trial court found "[e]verything she did that day was just wrong" and "led to the untimely demise of a father, of a son, of a cousin, of a nephew." The trial court found Defendant a Range I, Standard Offender who gave "[s]elf-serving, incredible" testimony on her own behalf. The trial

court found Defendant, who let the victim "bleed to death for 15 minutes while [she made] phone calls" to be exceptionally cruel. The trial court also found the injuries inflicted on the victim to be particularly great and that Defendant possessed a deadly weapon and no hesitation about committing a crime when the risk to human life was high. The trial court applied enhancement factors (5), (6), (9), and (10). The trial court later corrected itself, removing the enhancement factor for committing a crime when the risk to human life was high. The trial court found Defendant was not a suitable candidate for probation and sentenced her to twenty-five years.

First, we note that Defendant's assertion that the trial court applied four enhancement factors is simply incorrect. The trial court removed factor (10) from consideration after the State pointed out that it did not apply to Defendant's second degree murder conviction because it was an inherent part of the crime. *State v. Hayes*, No. M2024-00851-CCA-R3-CD, 2025 WL 947127, at *10 (Tenn. Crim. App. Mar. 27, 2025), *perm app. denied* (Tenn. June 20, 2025). The State, however, concedes that the trial court misapplied enhancement factor (6), that the personal injuries inflicted on the victim were great, because death is an essential element of second degree murder, and we agree. *See, e.g., State v. Miller*, No W2023-01128-CCA-R3-CD, 2024 WL 2698894, at *12 (Tenn. Crim. App. May 24, 2024), *perm. app. denied* (Tenn. Oct. 25, 2024). However, the application of an improper enhancement factor is not enough to reverse a sentence. *State v. Pitt*, No. M2022-01730-CCA-R3-CD, 2023 WL 8647933, at *5 (Tenn. Crim. App. Dec. 14, 2023) (citing *Bise*, 380 S.W.3d at 705-06), *perm. app. denied* (Tenn. May 16, 2024). Moreover, the trial court properly applied enhancement factors (5) and (9), that Defendant treated the victim with exceptional cruelty and that Defendant used a deadly weapon during the commission of the offense. T.C.A. § 40-35-114(5), (9). Defendant stabbed the victim with a knife and called several other people before calling 911. When she finally called for help, she gave a false name and told officers the incorrect apartment number, prolonging any medical assistance that could have helped the victim live. The first officer on the scene described the victim's body as "cold to the touch."

Defendant also argues that the trial court failed to consider mitigating factors to reduce the sentence. The trial court considered and rejected Defendant's mitigation proof, finding her testimony not credible and placing little to no weight on mitigation, especially given Defendant's institutional history. The trial court's consideration of and refusal to apply mitigating factors is within its discretion. *Bise*, 380 S.W.3d at 706 ("[M]ere disagreement with the trial court's weighing of the properly assigned enhancement and mitigating factors is no longer a ground for appeal."). Here, the trial court considered the relevant statutory factors, the evidence, and the purposes and principles of sentencing in fashioning Defendant's twenty-five-year sentence. The trial court did not abuse its discretion. Defendant is not entitled to relief.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.


_S/Timothy L. Easter_
TIMOTHY L. EASTER, JUDGE